EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Public Corruption & Civil Rights Section
MAX B. SHINER (Cal. Bar No. 187125)
WILSON PARK (Cal. Bar No. 239527)
Assistant United States Attorneys
Violent & Organized Crime Section
     1300/1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091/3308/5796
     Facsimile: (213) 894-6436/3713
     E-mail:    mack.jenkins@usdoj.gov
                max.shiner@usdoj.gov
                wilson.park@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-338(A)-SJO-29 |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION REGARDING PRESENTENCE REPORT FOR DEFENDANT ROBERT BARNETT |
| v. | |
| TYRINE MARTINEZ, et al., [ROBERT BARNETT] | Sentencing Date: 12/12/16<br>Sentencing Time: 9:00 a.m. |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California, hereby files its Government's Position Regarding Presentence Report for Defendant Robert Barnett.

///

///

///

This Position is based on the files and records in this case, the attached Memorandum of Points and Authorities, the Presentence Investigation Report ("PSR"), and any other further information that may be requested by the Court.

Dated: November 28, 2016            Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

         */Max B. Shiner/*
MAX B. SHINER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I. INTRODUCTION......................................................1

II. GUIDELINES CALCULATIONS..........................................2

    A. PSR's Calculations..........................................2

    B. Government's Objections and Corrections to the PSR..........4

    C. Defendant's Objections to the PSR...........................4

    D. Government's Guidelines Calculations and Recommendations....6

III. RELEVANT EVIDENCE...............................................7

    A. Defendant Is an Active Broadway Crips Gang Member and Gremlin Riderz Clique Member Who Dealt Crack Cocaine and Engaged in Violent Firearms-Related Crime as Part of His Gang Conduct........................................7

IV. SUPPORT FOR GOVERNMENT'S RECOMMENDATION........................11

    A. The Government's Recommended Sentence Is Within the Guidelines...............................................11

    B. Relevant 18 U.S.C. § 3553(A) Factors......................11

        1. Mitigating Factors.................................13

V. CONCLUSION......................................................15

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

On July 18, 2016, defendant ROBERT BARNETT, also known as "Baby Ange," ("defendant"), pled guilty to two counts of the First Superseding Indictment. (PSR ¶ 2.) Specifically, defendant pled guilty to the following:

Count One, in violation of 18 U.S.C. § 1962(d) (RICO conspiracy), based on defendant's agreement to work with the Five Deuce Broadway Gangster Crips criminal street gang (the "Broadway Crips" or "BGC") to engage in racketeering activity, including trafficking crack cocaine. (PSR ¶ 3; Plea Agreement ¶ 16.)

Count Twelve, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B)(iii), based on defendant's participation in the Broadway Crips' drug trafficking conspiracy, including a conspiracy to distribute at least 28 grams of crack cocaine. (PSR ¶ 4; Plea Agreement ¶ 16(p).)

The government concurs with the advisory United States Sentencing Guidelines ("Guidelines") calculations and factual findings set forth in the PSR, except as set forth below.

The government recommends that the Court sentence defendant to **105 months' (8¾ years') imprisonment**, followed by a **supervised release period of five years** with the parties' stipulated special conditions: (a) that defendant not reside in Broadway Crips' territory[1] (b) that he be subject to search by any law enforcement

---

[1] United States v. LaCoste, 821 F.3d 1187, 1191-92 (9th Cir. 2016) ("Residency restrictions are unquestionably permissible as a general matter. Congress has authorized district courts to impose conditions requiring that a defendant 'reside in a specified place or area, or refrain from residing in a specified place or area' . . . .

1

entity, of his person, residence, vehicle, or cell phone, <u>with or without reasonable suspicion</u>, at any time.[2]  Defendant must pay a mandatory special assessment of $200.  The government recommends the fines be waived.

**II.   GUIDELINES CALCULATIONS**

   **A.   PSR's Calculations**

The USPO, in its PSR, submits the following Guidelines calculations in this matter:

| GUIDELINE | LEVEL |
|---|---|
| Base Offense Level:<br>RICO Conspiracy + Drug Trafficking Predicate<br>[USSG § 2E1.1]<br><br>Drug Trafficking Conspiracy:<br>At least 28g but less than 112g of crack cocaine<br>[USSG § 2D1.1(c)(8)] | 24<br><br>(PSR ¶¶ 41-43.) |

---

There are of course situations in which a defendant's ties to his former community may not be a positive influence, and in such cases a condition of supervised release barring the defendant's return may well be justified.  Courts have typically upheld so-called 'banishment' conditions when the defendant's ties to a particular area contributed to his past criminality, thus increasing the likelihood that he will re-offend if he returns.") (emphasis added). <u>See, e.g.</u>, <u>United States v. Watson</u>, 582 F.3d 974, 983–85 (9th Cir. 2009); <u>United States v. Sicher</u>, 239 F.3d 289, 291–92 (3d Cir. 2000); <u>United States v. Cothran</u>, 855 F.2d 749, 752 (11th Cir. 1988).

   [2] The Ninth Circuit has recognized the validity of such conditions even where investigators are <u>not</u> required to have reasonable cause.  <u>United States v. King</u>, 608 F.3d 1122, 1131 (9th Cir. 2010) ("the imposition of the search condition was reasonably related to protecting the public and preventing recidivism") (citing <u>United States v. Betts</u>, 511 F.3d 872, 876 (9th Cir. 2007)).  Furthermore, under Ninth Circuit law, the terms of defendant's search condition must explicitly state that it includes his cellphone.  <u>See</u> <u>United States v. Lara</u>, 815 F.3d 605, 610 (9th Cir. 2016) (Requiring probation terms to explicitly state that its search terms include cell phones because "[j]ust as it makes no sense to call a cell phone a 'container' for purposes of a search incident to arrest (<u>Riley</u>) or search of an automobile (<u>Camou</u>), it makes no sense to call a cell phone a 'container' for purposes of a probation search." (internal citations omitted).)

| | |
|---|---|
| Possession of a Firearm [USSG § 2D1.1(b)(1)] | +2 (PSR ¶ 44.) |
| Career Offender [USSG § 4B1.1] | Adjusted Offense Level 34 (PSR ¶¶ 50-51.) |
| Acceptance of Responsibility [USSG § 3E1.1(a)] | -2 (PSR ¶ 52.) |
| **TOTAL OFFENSE LEVEL** | **32** (PSR ¶ 53.) |

The PSR initially found an Adjusted Offense Level of 26 (PSR ¶ 49) which, with the Acceptance of Responsibility adjustment, would result in a Total Offense Level of 24. The PSR initially placed defendant in Criminal History Category V, based on 11 criminal history points. (PSR ¶ 64.) This would have established a Guidelines range of 92-115 months' imprisonment. (USSG Chapter Five (Sentencing Table).) However, because defendant is a Career Offender under USSG § 4B1.1 and 4B1.2, his criminal history category is VI. (PSR ¶ 65.) The advisory sentencing range, after the application of the Career Offender guideline, was calculated as 210-262 months' imprisonment. (PSR ¶ 118.)

There is a 60-month mandatory minimum custodial term due to defendant's Count 12 conviction for conspiring to distribute at least 28 grams of crack cocaine. (PSR ¶ 117.) Defendant faces a supervised release range of a minimum of four years (PSR ¶¶ 120) and a fine range of $17,500 to $5,000,000. (PSR ¶ 127.) Defendant must pay $200 in special assessments. (PSR ¶ 126.) The USPO's recommendation is confidential.

///

3

The USPO did not identify any factors that would warrant a departure from the applicable sentencing guideline range. (PSR ¶ 133.) The USPO rejected defendant's claims that his criminal history category is over-stated. (PSR ¶ 135-136.)

The USPO did not identify any factors that would warrant a variance outside of the advisory guideline range. (PSR ¶ 137.)

**B. Government's Objections and Corrections to the PSR**

<u>Supervised Release Maximum Term</u>. While the PSR correctly notes that the Court must impose a mandatory minimum term of "at least four years" of supervised release on Count Twelve, it omits stating the maximum term the Court can impose, which leaves the Court without guidance on its options under the law. (PSR ¶ 81.) The Ninth Circuit has made clear that the maximum supervised release term here, under Count Twelve, is life. <u>United States v. Garcia</u>, 112 F.3d 395 (9th Cir. 1997) (holding that a maximum life term of supervised release was permissible under § 841(b)(1)(C), which sets a minimum term but no maximum term); <u>see also</u> <u>United States v. Hermosillo</u>, 622 F. App'x 680, 682 (9th Cir. 2015) ("[Ninth Circuit precedent] compel[s] the conclusion that, like § 841(b)(1)(C), § 841(b)(1)(B) authorizes a maximum life term of supervised release that overrides the shorter maximum terms authorized by § 3583(b).").

**C. Defendant's Objections to the PSR**

According to the PSR, defendant claims that his criminal history is overstated because (1) he did not commit the 2006 assault with a firearm (discussed below), (2) his driving with a suspended license case was assigned two points due to a violation of probation, (3) his 2012 conviction for possession of a controlled substance should not count because it has been reduced to a misdemeanor, and (4) he does

4

not qualify as a career offender. None of these objections have merit.

First, defendant pled guilty to the 2006 assault with a firearm, and the evidence indicating he committed the offense is strong, as discussed below. Because defendant was convicted of this offense and a controlled substance offense, possession of cocaine for sale in 2005 (PSR ¶ 57), he qualifies as a career offender. As explained in the PSR, the sentencing guidelines and commentary do not confer the defendant any right to collaterally attack a prior conviction or sentence beyond any rights otherwise recognized in law. In <u>Custis v.United States</u>, 571 U.S. 485 (1994), the United States Supreme Court determined that, except for convictions obtained in violation the Sixth Amendment right to counsel, a defendant is not allowed to collaterally attack prior state court convictions. Furthermore, in <u>United States v. Martinez-Martinez</u>, 295 F.3d 1041 (9th Cir. 2002), the Ninth Circuit Court held that a defendant's request for downward departure based upon the legitimacy, not the nature of the conviction, constitutes a collateral attack prohibited under <u>Custis</u>.

Second, his driving on a suspended license offense was properly counted. Far from being mitigating, the fact that defendant had his probation revoked (after two bench warrants were issued for his arrest (PSR ¶ 60)) shows his disregard for the law and the sentencing court's orders, and the additional time he served due to the probation revocation is properly counted in the sentence because it is reflective of the sentencing court's judgment of the severity of his conduct. (<u>See</u> USSG § 4A1.2(k) (calling for any term of imprisonment upon revocation of probation to be added to the original term for purposes of calculating the criminal history score).)

5

Furthermore, while one traffic offense might be an aberration, defendant had a prior (uncounted) conviction for the same offense at the time of his arrest for driving with a suspended license (see PSR ¶ 59), and has multiple other traffic-related arrests or pending cases that demonstrate a pattern of unlawful driving (and riding in stolen cars) that, if anything, indicate the criminal history score is understated. (See PSR ¶¶ 67, 68, 70, 71, 72, 74, 76, 77, 78, 79.)

Finally, defendant's 2012 conviction for possession of a controlled substance is properly counted because it resulted in a 365-day sentence. While it was later reduced to a misdemeanor, the court did not issue a new sentence. If the defendant received a sentence of imprisonment of at least 60 days, then USSG § 4A1.1 requires the court assess a two-point increase to his criminal history score, irrespective of whether the conviction is a felony or a misdemeanor. (Cf. United States v. Buzo-Zepeda, 609 F.3d 1024 (9th Cir. 2010)).

### D. Government's Guidelines Calculations and Recommendations

The government concurs, with the exception of the issues noted above, in the guidelines calculations and factual findings in the PSR. The government concurs that defendant is a Career Offender and is placed in Criminal History Category VI. As explained more fully below, the government anticipates moving for the third point for acceptance of responsibility under USSG § 3E1.1, which creates an advisory guidelines range of 188-235 months' imprisonment. The government recommends the sentence as set forth in the Introduction, namely, 105 months' imprisonment. The government further recommends five years of supervised release, a $200 special assessment, and that all fines be waived.

Further, also pursuant to the plea agreement, the government will move at the time of sentencing to dismiss as against defendant the remaining counts of the First Superseding Indictment, namely, Counts Twenty (Possession with Intent to Distribute Crack Cocaine), Thirty-Eight (Distribution of Crack Cocaine Near a Protected Location), and Ninety-Four (Possession of Firearms in Furtherance of a Crime of Violence and a Drug Trafficking Crime).  (PSR ¶¶ 11-13.)  The government will also move to dismiss as against defendant the underlying Indictment, as well as to dismiss the information alleging prior convictions pursuant to 21 U.S.C. § 851.  (PSR ¶ 8.)  Defendant agrees to waive his right to appeal provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 105 months' imprisonment.  (Plea Agreement ¶ 24.)

## III. RELEVANT EVIDENCE

### A. Defendant Is an Active Broadway Crips Gang Member and Gremlin Riderz Clique Member Who Dealt Crack Cocaine and Engaged in Violent Firearms-Related Crime as Part of His Gang Conduct

A general summary of defendant's racketeering conduct is set forth in the PSR, and, to some extent, the Plea Agreement.  (PSR ¶¶ 17-32; Plea Agreement ¶ 16.)  In sum, defendant has been an active member of the Broadway Crips since at least 2005, and is a member of the gang's violent enforcement clique, the Gremlin Riderz.  (PSR ¶¶ 20-21, Plea Agreement ¶¶ 16(c)-(d).)  Defendant agreed with other members of the Broadway Crips that Broadway Crips members would maintain the Broadway Crips' territorial monopoly for the purpose of selling drugs and committing other crime in the gang's territory.  (PSR ¶ 22, Plea Agreement ¶ 16(e).)  In furtherance of the gang's drug trafficking and racketeering, defendant would sell drugs within

the gang's territory, protect the gang's territory from rivals, and would ensure that only Broadway Crips or permitted associates sold drugs within the gang's territory.

Defendant appears to have dealt crack cocaine throughout his time as a Broadway Crip. As early as November 10, 2005, defendant possessed crack cocaine for sale; officers found 25.6 gross grams of cocaine, cash, and a scale in defendant's room. (PSR ¶ 57; Plea Agreement ¶ 16(g).) On October 13, 2011, defendant and co-defendant Lord Kelly (who possessed a handgun) were found in a residence in Broadway Crips' territory with two bindles of crack cocaine, marijuana, digital scales, a box of 9mm ammunition, and a Ruger 9mm handgun (which had been used in a gang murder less than three weeks earlier). (PSR ¶ 25; Plea Agreement ¶ 16(i).) On October 8, 2012, in Broadway Crips' territory, defendant sold crack cocaine, was arrested, and was found with additional crack cocaine secreted in his anus. (PSR ¶ 27 and n.2; Plea Agreement ¶ 16(k).) Again, on October 18, 2012, in Broadway Crips' territory, defendant possessed cocaine for sale. (PSR ¶ 61; Plea Agreement ¶ 16(l).) Intercepted telephone calls established that defendant was an associate of co-defendants Roosevelt Sumpter ("Sumpter") and Tyrine Martinez ("Martinez") and was a part of their drug distribution network. Martinez stated on one call that defendant would be "good" in the Broadway Crips drug selling territory that night, and, on another call, co-defendant Cameron Hall, also known as "Deuce Pound" ("Hall"), told Martinez that defendant had just purchased two ounces of crack cocaine. (PSR ¶¶ 28-29; Plea Agreement ¶ 16(m)-(n).) On February 1, 2013, Sumpter instructed Martinez that defendant be allowed to purchase drugs through Hall, and later instructed Martinez to give the remainder of

8

his drug supply to defendant. (See Exhibit 1 (draft linesheets of intercepted calls).) On the date he was arrested in this case, defendant was in possession of large amounts of cash, marijuana, and a round of 9mm ammunition. (PSR ¶ 32.) Based on his Instagram posting, defendant apparently thought of himself as something of a "kingpin" who for whom criminal charges were no deterrent. (See Exhibit 2 (excerpt from Instagram business records for defendant's account, "babyangel52").)

But defendant was not simply a drug dealer. As an active member of the Broadway Crips and the Gremlin Riderz, defendant was willing to commit violence to protect the gang's drug territory and to retaliate against rivals. For example, defendant joined a group of Broadway Crips on a mission to assault rival East Coast Crips members on February 8, 2013. (PSR ¶ 30; see Exhibit 3 (draft linesheets of calls showing Martinez and co-defendant Keefe Dashiell ("Dashiell") responding to location where suspected East Coast Crip gang members are confronting a group including Dashiell's daughter; Martinez asks both Dashiell and Sumpter for guns, and Martinez twice confirms that defendant ("Baby Ange" or "BA") is going to the location with them).)

This pattern of involvement in the violence perpetrated by Gremlin Riderz is documented by defendant's 2006 conviction for assault with a firearm, for which he received a seven-year state prison sentence. (PSR ¶ 58.) In this incident, which involved two separate shootings at rival East Coast Crips members, defendant drove co-defendants Ricky Keaton ("Keaton") and Andre Griffin ("Griffin") to the scenes of both shootings. Griffin was arrested leaving the area of a burning car, which witnesses later identified as the car used in the shooting. Defendant and Keaton were arrested together

9

approximately one block away from the burning car and defendant was identified by two witnesses as the driver in the assaults. The burning vehicle was identified as having been reported stolen earlier that day, and defendant had a "shaved" car key in his pocket. (PSR ¶ 58; see also Exhibit 4, filed under seal (LAPD report of incident).) Defendant pled guilty to the offense of assault with a firearm. (PSR ¶ 58.)

Nevertheless, despite his guilty plea, he has asserted to the Probation Office that he did not commit the crimes. (PSR ¶ 135.) However, the facts belie this claim: defendant was identified by two witnesses as the driver of the car involved in the two shootings, he was arrested shortly after the offense and a block away from the burning vehicle used to commit the offense. The vehicle had been stolen earlier that day and defendant had a shaved key, used for starting stolen cars, in his pocket at the time of his arrest. (See Exhibit 4, filed under seal.) One of the admitted shooters was found walking away from the burning car, was also identified, admitted his role in the offense before this Court, and detailed the facts of the assault to law enforcement. (See CR 1050; Exhibit 5, filed under seal). The other shooter, Keaton, was present with defendant when he and defendant were arrested, and Keaton admitted his role in the shooting before his court. (See CR 1741.) These facts render any claim that he was misidentified and pled guilty despite not being involved in the assaults highly improbable.

The government has been informed by defense counsel that defendant will not be arguing at his sentencing hearing that he is innocent of the 2006 assaults. The sentencing recommendation contained herein assumes that is the case, and the government will,

10

with this understanding, move for a third point for acceptance of responsibility.

Because defendant's conduct in the assaults forms an important foundation in understanding defendant's role in the Broadway Crips enterprise as not merely a low-level drug dealer but an active and violent Gremlin Riderz member as well, his claim to the Probation Office casts a shadow over his sincerity, and hinders the proper assessment of his conduct for purposes of sentencing.  The government believes this may properly be taken into account in formulating the sentence.

**IV.   SUPPORT FOR GOVERNMENT'S RECOMMENDATION**

    **A.   The Government's Recommended Sentence Is Within the Guidelines**

Because of defendant's instant convictions he faces a mandatory minimum term of imprisonment of 60 months' imprisonment and mandatory minimum four years of supervised release.  (PSR ¶¶ 117, 120.)  The government recommends a sentence of 105 months' imprisonment, which is almost seven years below the low end of the applicable sentencing guidelines range (188-235 months) but is at the high end of the range applicable prior to the application of the Career Offender guideline (84-105 months).

    **B.   Relevant 18 U.S.C. § 3553(A) Factors**

The government submits that its recommended sentence is supported by the factors set forth in 18 U.S.C. § 3553(a), both aggravating and mitigating, as set forth in the First Superseding Indictment, the PSR, and defendant's plea agreement.  First, defendant admitted knowingly conspiring with the Broadway Crips criminal enterprise to further the racketeering conduct of a gang

11

that has terrorized and held hostage a vulnerable population for decades.  Defendant's own racketeering conduct stretched back more than a decade, and his criminal history dates back to 2001 (when defendant was age 13).  (PSR ¶¶ 20, 56.)  Next, as part of his admitted RICO conduct, defendant was a member of the Gremlin Riderz, which essentially operated as the gang's armed hit squad.  (PSR ¶ 21.).  Defendant committed assault on suspected rival gang members, joined with Martinez and other members in an attempt to attack East Coast Crips, and worked closely with Martinez, the leader of the Gremlin Riderz, to traffic drugs in the Broadway Crips territory.  (PSR ¶¶ 22, 24-32, 57-58.)

Defendant was also an active drug dealer who was a part of the network managed by co-defendants Sumpter and Martinez, which supplied drugs to other Broadway Crips members for re-distribution and sale.  Defendant's criminal history demonstrates how the gang's drug trafficking and racketeering activities evolve into violent retaliation as a routine way of settling scores and protecting the gang's drug territory.  The harm to the community inflicted by this conduct requires a substantial sentence to reflect the seriousness of the offense and to provide deterrence from future criminal conduct.

Defendant has not been an exemplary inmate at MDC.  Defendant was found by MDC staff to have stolen money from a co-defendant's account, by transferring money from the account to his fiancée and her aunt.  (PSR ¶ 16.)

In addition to specific deterrence of defendant from committing future crimes, <u>general</u> deterrence is also of paramount importance in fashioning a meaningful sentence.  As sagely stated by a co-

///

defendant's counsel regarding the co-defendant's sentencing in this matter:

> when others in the local community see that [defendant] receives a . . . [significant sentence] from the Federal Court for being a gang member with all of its concomitant activity, such as dealing drugs, exhibiting gang solidarity by attending a funeral and a "Hood Day," . . . and packing around a firearm, such a sentence will send a message to all youngsters contemplating gang membership that they better respect the law.

(Sentencing Position of Cedric Johnson; Clerk's Record 1154 at 8.) The government believes the same deterrence rationale applies to all those who would abet the gang's members in their criminal racketeering activities and thereby assist the gang in terrorizing the community.

### 1. Mitigating Factors

Defendant has several mitigating factors. Like many minority youth in inner-city Los Angeles, defendant grew up without a positive male parental role model, his father having left the family when defendant was young. (PSR ¶¶ 84, 87.) Defendant's stepfather introduced him to criminal conduct and drug abuse, and physically abused him. (PSR ¶ 87, 89, 101.) Defendant began working at the Broadway Crips' drug house at the age of 15. (PSR ¶ 91.) Defendant's mother provides an account of defendant's childhood that is less traumatic and severe, explaining that the family only sold stolen pills for a short time, that defendant was physically punished for taking a 20-dollar bill from her purse, and that she disapproved of defendant working at a drug house. (PSR ¶ 92.)

Defendant earned money due to his association with the Broadway Crips (PSR ¶ 91), but for the past 3½ years has been in a

///

13

relationship with a woman who provided ample money that was carelessly squandered, according to defendant's mother. (PSR ¶ 93-94.)

Defendant has a history of abusing alcohol, marijuana, ecstasy, methamphetamine, and cocaine, and has completed a drug treatment program. (PSR ¶¶ 101-102.) Defendant did not complete high school due to his addiction. (PSR ¶ 104.)

The government asserts that its plea agreement and recommended sentence incorporates all of these factors. The government provided a favorable plea agreement to defendant, largely because of his agreement to resolve his case early and take responsibility for all relevant facts. This plea agreement offers significant benefits to defendant. Namely, the plea agreement extended by the government provides for a five-year, rather than a ten-year, minimum sentence, and the government agreed to dismiss an information alleging a prior conviction under § 851. The recommended sentence resulting from the plea agreement is far below what defendant could have faced had he been convicted on all counts, and nearly seven years below the applicable sentencing guidelines range. Notwithstanding these benefits, the sentence must take into account all of the facts surrounding defendant's conduct and be designed to reflect, to defendant and the community, the seriousness of the instant racketeering offenses and the damage that gangs do to communities.

///
///
///
///

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests the Court sentence defendant ROBERT BARNETT as recommended above, namely:

- 105 months' imprisonment;
- Five years supervised release, with special conditions:
    - Gang territory residence restriction;
    - Search conditions;
- $200 special assessment; and
- Fines waived.

15